Filed 10/28/20  In re S.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re S.T., a Person Coming Under the Juvenile Court Law. | D077317 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>S.F. et al.,<br><br>       Defendants and Appellants. | (Super. Ct. Nos. J520104; J520104A) |


APPEALS from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.


Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant D.T.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant S.F.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Jesica N. Fellman, Deputy County Counsel for Plaintiff and Respondent.

At birth, S.T. tested positive for marijuana and his meconium later tested positive for methamphetamine. After the San Diego County Health and Human Services Agency (Agency) commenced these proceedings, his mother, S.F. (Mother), requested a one-day continuance to retain counsel. But instead of returning to court with a lawyer, Mother absconded with S.T. for over four months. D.T. (Father) claimed he did not know their whereabouts; however, at trial he conceded harboring Mother and S.T. for several weeks at his northern California home.

At the jurisdiction and disposition hearing, the juvenile court declared S.T. a dependent (Welf. & Inst. Code,[1] § 300, subd. (b)(1) [hereafter, § 300(b)(1)]) and removed him from the parents' care. Mother and Father contend the court's findings are not supported by substantial evidence. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *S.T. Tests Positive for Marijuana and Methamphetamine*

At birth in June, S.T.'s urine tested positive for marijuana, and the same day Mother tested positive for marijuana and methamphetamine.[2] Mother admitted smoking marijuana three times per day, but denied methamphetamine use. She claimed her marijuana must have been laced. On July 18, S.T.'s meconium tested positive for methamphetamine.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Dates are in 2019 unless otherwise specified.

2

B.  *Mother No Shows for Drug Tests, Then Tests Positive*

Attempting to avoid formal dependency proceedings, the Agency created a safety plan with Mother, which included that Mother drug test. However, Mother did not show for the scheduled test, claiming she lost the test facility's address.  Mother agreed to drug test on July 22, but again was a no show.  On July 26, Mother tested positive for methamphetamine, amphetamine, THC, and alcohol.  The same day, she refused to allow the Agency access to S.T.  Mother told the Agency that she gave temporary custody of S.T. to a friend while Mother addressed her "methamphetamine issue."  These proceedings followed because Mother could revoke that arrangement at will.

C.  *Dependency Petition and Detention Report*

On August 1, the Agency filed a dependency petition (Petition) under section 300(b)(1), alleging that S.T. "has suffered or there is a substantial risk that the child will suffer serious physical harm or illness."

The Agency identified D.T. as S.T.'s father.  Mother told the Agency that she had no contact with him since S.T.'s birth.[3]

D.  *Detention Hearing*

At the detention hearing on August 2 (a Friday), Mother declined appointed counsel and requested a continuance to retain counsel.  Mother assured the court she would retain counsel "by Monday."  The Agency opposed that request because Mother had refused to disclose where S.T. was

---

[3]    Mother has two other children, H.G. (age 6) and J.H. (age 13).  In December, the Agency also filed a section 300(b)(1) petition regarding H.G. The juvenile court dismissed that petition for insufficient evidence of substantial risk of harm.  That ruling is unchallenged.

living.[4]  County Counsel asked the court to appoint counsel over Mother's objection and compel Mother to disclose S.T.'s whereabouts.  Counsel explained that the day before, Mother led the Agency on a "wild-goose chase"—Mother's family and friends told the social worker where to find S.T., but at each location, "the child was either not there or that individual would not answer the door."

Giving Mother "the benefit of the doubt," the court granted a one-court-day continuance and ordered Mother to appear on August 5.

E.  *The August 5 Hearing*

Mother failed to appear and S.T.'s whereabouts remained unknown. Father, who had left the family home before S.T.'s birth, denied knowing about Mother's methamphetamine use during pregnancy.  The court assured Father that Mother's misconduct would not be attributed to him "unless you're involved with it."

The court issued a bench warrant for Mother, but at Father's request held it one day so Father could, in his words, "try to talk some type of sense into [Mother]" because "she doesn't realize that she's making things worse right now."  The court instructed Father to immediately notify the social worker if he learned anything about Mother's whereabouts, stating:

> "The Court:  *If you have any information whatsoever about where she is, let the social worker know that immediately.* That will not only bode well for you in possibly getting detention [custody] in the future showing that you are protective of the child, but it also will help us get custody of the child so the lawyer can be appointed to represent the child and we can proceed with making sure everybody gets

---

[4]  Mother reported that S.T. was with Father; however, when the Agency contacted the phone number Mother provided for him, the person who answered said he was not S.T.'s father.

4

the proper services in this case. . . . [¶] [D]o what you can to get her in here." (Italics added.)

The same day, the social worker (accompanied by police) made an unannounced visit to Mother's residence. Mother denied that S.T. was there, but would not disclose where S.T. was staying. Subsequently, the court released the warrant and set the jurisdiction and disposition hearing.

F. *Agency Interviews Father*

Father told the social worker that he and Mother ended their relationship three to four months before S.T.'s birth, and efforts to reunite failed because Mother was drinking and using methamphetamine, which he disapproved. Father wanted Mother to "complete a drug program."

Father denied knowing S.T.'s whereabouts, asserting that Mother will not tell him "anything." Father added that Mother "does not listen to authority and she would resist turning in [S.T.]." Father told the social worker, "it would be very hard to turn in [S.T.] to the Agency" should he find him.

G. *Father's Criminal History*

At the August 22 hearing, the Agency requested a continuance because Mother and S.T. remained at large. Meanwhile, the Agency had obtained Father's criminal history, showing arrests in nine different states for numerous offenses between 1994 and 2019, plus an outstanding Florida warrant for disorderly conduct.[5]

---

[5] The Agency reported that Father had arrests for: burglary (1994, 1995); grand theft (1995); disobeying court orders (1997); vehicle theft and pandering (1997); possessing controlled substances (1998), inflicting corporal injury on spouse/cohabitant (1999); loiter: intent: prostitution (2000); driving while license suspended or revoked, possessing less than one ounce of marijuana, giving false name to law enforcement (2000, Georgia), burglary, forgery, obtaining money by false pretenses, possessing controlled substance,

5

Father also has convictions for: possessing controlled substances (1998); aiding prostitution (2001); driving without a license (2001); possessing false identification, making a false financial statement, identity theft, forgery, failure to disclose the origin of a recording or audiovisual work (2003); possessing false identification, making false financial statements, identity theft, forgery (2005); perjury (2010); driving without a license (2011); driving while license suspended (2012); driving while license suspended or revoked, possessing less than one ounce of marijuana (2013); counterfeit trademark (2016); and criminal simulation (2018).

---

aiding prostitution, failure to appear (2001); failure to disclose origin of recording, forgery, possessing controlled substance (2003); failure to disclose origin of recording or audiovisual work (2004); unregistered vehicle, possessing marijuana one ounce or less, unlawful reproduction/sale of recordings (North Las Vegas, 2005); fugitive from justice (Las Vegas, 2005); forgery (2005); fugitive from justice (2006); unlawful reproduction/sale of recordings (Las Vegas, 2006); counterfeit of registered mark, failure to appear, driving while license suspended, excessive speed (2008); displaying fake identification card, manufacturing/selling counterfeit registered mark, driving with suspended license, reckless [driving], perjury (2009); driving while license suspended, counterfeit registered mark, driving without license, failure to appear (2011); storing materials on public sidewalk; soliciting business without license (Las Vegas, 2012); driving while license suspended, unbelted child, no vehicle registration, improper display of license plates, driving while license suspended, failure to prove financial responsibility (2012); failure to appear (2013); driving while license suspended or revoked (Georgia, 2013); use or possession of drug paraphernalia; possessing narcotic equipment (Utah, 2014); counterfeit trademark (Illinois, 2015); driving under the influence of alcohol/drugs (Ohio, 2016); driving with suspended license (2017); public order crimes (Denver, 2017), criminal simulation, possessing controlled substances (2018); criminal use of counterfeit trademark (2018 (Raleigh); driving while license suspended, improper display of license plates; no registration (2019).

## H. *Father's Other Children*

Father has two children from another relationship, who since 2016 have been under the maternal grandmother's guardianship because "both the father and the mother of the children were in jail." In 2018, Father sought to terminate the guardianship. The court-appointed attorney representing the children told the social worker that Father "has not been cooperative."

## I. *Mother and S.T. Remain At Large, Using Father's Money*

In late August, the Agency explained to Father the "risks and danger to a child with a parent who has an untreated substance use issue when the parent [is] caring for the child." Nevertheless, on September 23, Father confessed that he had been giving money to Mother while she remained a fugitive, purportedly to buy food for S.T. The court instructed Father, "don't give her any more money until she brings the child to the social worker" and admonished Father to stop enabling Mother's flight, stating:

> "The Court: You can't keep enabling her. That is what you are doing. You are enabling her to stay on the run, and putting your son in danger. That is what you are doing. [¶] It's her choice at that point. She either brings the child to the social worker, or she does not get money from you. One of the two. [¶] If you keep giving her money, she has no incentive to bring the child in. She will just run as much as she can. . . . [¶] We have to get the child in."[6]

After Father replied that he would "try my best to locate [Mother]," the court stated, "You need to take the child immediately to the social worker if you get the child." Father replied, "Yes, sir."

---

[6] Father's brief inaccurately states that the court "suggested" he not give Mother more money until she brought S.T. to the social worker.

The same day (September 23), Father told the social worker that he could persuade Mother to turn herself in—but only if the court released S.T. to Father. The social worker told Father "there is much more risk with [S.T.] being in his mother's care at this time given that she has [an] untreated substance use issue than if he is in foster care."

J. *Father's Contacts With Mother*

Later in September, the social worker inspected Father's northern California home. The house was very clean; in fact, empty except for baby supplies. Although Father frequently travels on business, his 55-year-old mother had agreed to care for S.T. at the home while he is away.

After returning to San Diego on September 27, the social worker was outside Mother's residence when she saw Mother driving a Chevrolet SUV with Florida plates. The social worker saw Father driving this same vehicle when she inspected his home. A few days later, a friend of Mother's told the social worker that during a recent phone call with Father, she heard Mother's voice in the background.

On November 19, Father informed the court that he was still giving Mother money. Father claimed to be caught in the "middle," stating: "If I take my child from [Mother] and say look, I'm taking him to the police, I'm taking him to the court, I have to deal with consequences from my family and her family." The court replied, "What are the consequences? All we're going to do is make sure the child is safe." The court again explained that by funding Mother's flight, Father was placing S.T. in harm's way:

> "What you're doing, though, is you're putting the child at risk. As long as the child continues to be with the Mother, the child is in danger. You giving food is like putting a band aid on a knife wound. It's not going to help the situation.

"You need to have the social worker get the child into protective custody and let us do our job. And I think you can help do that if you want to. And I don't know what else to say, we've been going on this now since the summer. But the social worker and the Agency and the court are not going to give up. We put the priority at [*sic*] the safety of children, and we all believe that at this point this child is unsafe.

"And if you want to continue to enable Mom, that's fine. That's your business. But sooner or later we're going to find her. We're going to get that child into protective custody. So if you can make that happen, make it easier on yourself, your child, and Mom, that would be great. I would appreciate any help you can give to [the] social worker . . . in locating Mom and getting her before the court with this child."

The court added, "I don't trust Mom. Mom didn't just stop using drugs as soon as she gave birth. She's still using them. The fact she's not cooperating with us tells us that she's using drugs daily probably. . . . I know you want to do the right thing, but the right thing is bringing the child in." When Father asked why S.T. could not be placed with him the court replied, "[R]ight now I think most of the people don't trust you, because you're not cooperating with us either."

K. *Mother in Custody*

On December 17, Mother was taken into custody while seeking inpatient admission to a drug treatment facility. Mother told that facility she was using methamphetamine 25 out of the last 30 days. The same day, Mother told the social worker she was "still using methamphetamine," but only twice a month. Mother stated she exaggerated her drug use to gain admission into the inpatient program.

L. *Father's Complicity and False Statements*

About this same time, the Agency discovered that Father knew much more about Mother's flight than he had reported to the court and Agency.

H.G. told the social worker that she had been living at Father's home and going to school. When the social worker confronted Father with that information, he admitted that Mother, along with her children (including S.T.) stayed at his northern California home. He claimed this was just for "a couple of days" while he was away on business. Actually, H.G. was enrolled in public school there from October 17 through November 22. Father signed the enrollment form, checking a box stating that H.G. lived with him.

At the jurisdiction and detention hearing, Father admitted that Mother and S.T. lived in his home for "[m]aybe three weeks." Father claimed he was away on business and "just allowed her to stay there." Father conceded that he allowed Mother to be alone with S.T. in his home, despite knowing of S.T.'s positive drug tests and that Mother was not in substance abuse treatment.[7]

M. *Mother's Continuing Drug Issues*

On December 18, the court placed S.T. in protective custody, recalled Mother's warrant, and dismissed her contempt charge. The Agency provided Mother with referrals to substance abuse treatment and encouraged Father to attend Naranon meetings and parenting class. He refused to attend Naranon, but agreed to attend a parenting class.

In late December, Mother told the social worker that she intended to enter a drug program on January 6, 2020. However, Mother did not complete intake. Instead, she threatened to put the social worker "behind bars" for

---

[7]    H.G. told the social worker that Father spent some nights in the home.

allegedly falsifying Mother's July 26 drug test results. The next day, Mother telephoned the social worker, stating, "I just want my fucking kids back." Mother terminated the call when informed that she needed to enter substance abuse treatment. Mother also refused a request to drug test, stating, "I don't need to do anything."

On January 16, the Agency asked Mother to drug test, but she again refused.[8]

N. *The Agency's Concerns About Father's Failure to Protect S.T.*

In a January 8, 2020 report, the Agency expressed concern that Father "was not protective" during the case "and allowed [Mother] to continue to care for [S.T.] while she was using methamphetamine despite being informed of the protective issue and the risk to [S.T.]." Father "repeatedly informed [the social worker] that he did not know of the Mother's or [S.T.'s] whereabouts and stated that he did not know the mother's phone number. However, while [Mother] was evading law enforcement and the Agency, [Father] assisted [Mother] by providing her with money, a phone, and a place to live." The Agency expressed "great concern" that Father not only knew of S.T.'s whereabouts, but allowed Mother to continue using methamphetamine while caring for S.T. The Agency concluded:

> "If [S.T.] was placed in [Father's] care at this time it is of concern that [Father] would return [S.T.] to [Mother] or expose [S.T.] to [Mother's] substance use; leading [S.T.] to be put back at risk of physical or emotional harm."

---

[8] A week before the jurisdiction and disposition hearing, Mother's lawyer asked the Agency to have Mother drug tested; however, the Agency declined because that test would not be random.

O. *Jurisdiction and Detention Hearing*

    1. *Mother*

At the February 2020 jurisdiction and detention hearing, the court received in evidence the Agency reports in the case.

Mother testified, admitting smoking marijuana during pregnancy for hip pain "and stuff . . . ." But she denied having a "drug problem" and denied ever knowingly taking methamphetamine.

Mother also denied taking a drug test on July 26—despite a laboratory report showing she tested positive on that date for amphetamine, methamphetamine, and THC. She testified that she declined drug treatment and drug tests because neither was court ordered.

Mother testified that she absconded with S.T. "because they were going to take away my child." She denied neglecting S.T. while they were on the run and insisted that S.T. had received appropriate immunizations and had no medical problems. Mother claimed that by lying about her extensive methamphetamine use, she was promoting her children's best interests by gaining admission to the inpatient services.

Thirteen-year-old Joy H. testified that she lived with Mother and H.G. before S.T. was born and never saw Mother taking drugs. Joy attended school, was never without food, and thought Mother is a "fine" parent. Joy wanted to live with her siblings and Mother.

The social worker testified that she gave Mother referrals to parenting classes and Narcotics Anonymous, along with "a whole packet of referrals for housing, mental health resources." However, Mother still has not started any substance abuse treatment program. Nor had Mother started a parenting

class. Mother also failed to attend the scheduled intake for mental health services.[9]

### 2. *Father*

Father testified that Mother was not using methamphetamine "on any regular basis" in 2019.[10] He stated that Mother "took care of her kids well. They went to school every morning. They ate every day." He would see Mother "possibly about" three times per week during this period. Father testified that Mother is "perfectly capable of taking care of her kids without supervision."

Father admitted sending Mother money when she was a fugitive. He explained, "I'm his father. If any of my kids are hungry, I'm not going to deny food to my kids no matter who tells me." Father also admitted that he did not call the social worker, even though for "roughly a few weeks" S.T. and Mother were residing in his home.

While denying that he has a "lengthy" criminal record, Father noted that he successfully completed parole in one case, and probation in another.

---

9    The social worker also testified that she was unable to "prove or disprove" whether Mother "maintained any length of sobriety during this case." However, a parent who consistently refuses to drug test without an adequate explanation is presumed to do so because she knows the results will show substance abuse. (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 ["common sense suggests a parent who consistently fails to appear for drug tests does so because of a consciousness of guilt"]; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*) [missed drug test is "properly considered the equivalent of a positive test result"].) Thus, despite the social worker's conclusion, the record supports a finding that Mother had not maintained sobriety.

10    There were no follow up questions about what Father meant by "any regular basis."

13

He agreed to obey all court orders, stating, "My willingness to obey authority is not a problem. It's only when you tell me not to feed my kids is when I have a problem."

### 3. *The Ruling*

#### a. *Introductory findings*

The court (Judge Willis) believed Mother's testimony that she had exaggerated her methamphetamine use to gain admittance to the treatment program. The court also gave little weight to Father's criminal history, expressing concern only with the perjury conviction.[11]

#### b. *Jurisdiction*

The court determined that S.T.'s positive drug tests "puts us well within" section 300(b)(1).

#### c. *Detention—Mother*

The court also ruled that the Agency "met their burden by clear and convincing evidence . . . that there would be a substantial danger" to S.T. if detained with Mother. The court found that Mother would not follow court orders relating to S.T., drug testing, "and things of that nature." "By clear and convincing evidence," the court found that S.T. should be "removed from the custody of the parents pursuant to . . . section 361 [subdivision] (c)" for "substantial risk of harm." The court stated that Mother's drug use and willingness to "obstruct the Agency" is "sufficient evidence that there is a risk of harm . . . ."

---

11    The court did not explain why Father's convictions for possessing false identification, identity theft, and forgery—crimes of dishonesty and prevarication—were not equally concerning.

### d. *Detention—Father*

The court tentatively favored placing S.T. with Father. Before making a final ruling, the court asked counsel to address "whether or not there's a reason to believe that [Father] and/or [Mother] would follow court orders as it relates to visitation and just general care of [S.T.]."

Answering those questions, S.T.'s lawyer suggested the court focus on the parents' insight into Mother's drug use, stating:

> "Mother certainly didn't show any insight because she denied that she ever used methamphetamine despite the fact that we have a positive meconium test, despite the fact that after [S.T.] was born, there is a positive test in black and white right in front of me in July that shows she was positive and some of the other statements she made.
>
> "But looking into [Father's] understanding that whether he shows insight, I asked him 'Are there any issues with Mother as a parent?' He said, 'No.' 'Are there'—in his opinion, 'Does Mother have a drug problem?' 'No.' He never saw anything. He doesn't know anything even though he lived with her. I grant the fact that he works a lot . . . . but, to me, what presents the problem with placement with him, at this point, is that lack of insight. . . .
>
> "The other problem is . . . there is a level of supervision. But, again, Father lives out of County and it's extremely difficult to monitor that situation and make sure that court orders are going to be followed and based on the history of this case, at least early on, I have a strong level of skepticism in regards to that.
>
> "I'm not foregoing that placement wouldn't be appropriate in the future, but, at this point, that's my position, that's what I'd ask the court to consider."

The court found by clear and convincing evidence that S.T. should continue to be removed from the parents' custody. Addressing Father, the

15

court stated, "I want you to participate in services and we're going to revisit this issue . . . [in] six months.  And I'm telling you right now, if I'm satisfied with your contact with the Agency, that the decision swings in your favor, it's just not swinging right now."

The court instructed Father to have "a line of communication and an open relationship" with the Agency, the lack of which was "one of the issues that [the court] had."  The hearing concluded with the court telling Father, "I expect in six months that the conversation swings in your favor because you're going to work with the Agency and show me that the reunification services are going to be fruitful . . . ."

DISCUSSION

I.

THE COURT'S JURISDICTION FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

A.  *Dependency Jurisdiction Under Section 300(b)(1)*

Section 300(b)(1) authorizes a juvenile court to exercise dependency jurisdiction where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."  The Agency must show by a preponderance of the evidence:  "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; § 355, subd. (a).)[12]

---

[12]    Mother and Father have filed separate briefs, but join in each other's arguments.  Only Father's brief asserts that the court's jurisdictional findings are not supported by sufficient evidence.

16

B. *The Standard of Review*

In reviewing the court's findings for substantial evidence, we "view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

C. *Substantial Evidence Supports the Jurisdictional Findings*

Father contends the court's jurisdiction findings are not supported by substantial evidence because there was "no proof that [S.T.] was born under the influence of, or with any other effect from, a dangerous drug . . . ."

This argument fails for two reasons. First, there is substantial evidence of actual harm. S.T. was born with marijuana and methamphetamine in his body. After delivery, S.T. had difficulty feeding and lost weight, in part because of Mother's drug use during pregnancy. When a child is born with illicit drugs in his body, it "creates a legal presumption that [he] is a person described by Welfare and Institutions Code section 300, subdivision (b)." (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378.)

Second, under section 300(b)(1), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. This statute requires a " 'substantial risk' " that the child will be neglected. (*In re E.E.* (2020) 49 Cal.App.5th 195, 212 (*E.E.*).) "[A] home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and

17

emotional well-being of the child." (§ 300.2.) Accordingly, "prenatal use of dangerous drugs by a mother is probative of future child neglect." (*In re Troy D.* (1989) 215 Cal.App.3d 889, 899.)

In his reply, Father contends that none of his conduct was alleged in the Petition and, therefore, cannot be relied to support the court's jurisdictional findings. However, dependency jurisdiction is taken over the child, not the parent. (§ 300; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent."].) Accordingly, even without considering any of Father's conduct, the court's jurisdictional findings are supported by substantial evidence.

Father also contends that even if his conduct is "material to the petition's allegations," evidence of his "evasive parental actions" do not show a substantial risk of harm to S.T. However, the record shows that Father would not adequately protect S.T. without the court's oversight. Father knew that Mother was using methamphetamine and he told the Agency that Mother needed substance abuse treatment. Mother's unresolved drug problem compromised her ability to care for S.T. (See *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284 [an unresolved methamphetamine addiction compromises a parent's ability to care for a child].) Despite this knowledge, Father funded Mother's flight and allowed her to stay with S.T. in his home, sometimes the only adult present.

Father defied the juvenile court's clear directive to notify the Agency immediately upon locating S.T. Moreover, at the jurisdiction hearing, Father denied Mother's methamphetamine use, claiming she needed no supervision. This refusal to follow court instructions to safeguard S.T., plus lack of insight

18

into the underlying dependency supports the court's finding that Father is not likely to modify his behavior without court supervision. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"]; See *In re S.O.* (2002) 103 Cal.App.4th 453, 461 [past conduct is probative of current risk where there is reason to believe it will continue].)

Relying on *In re J.A.* (2020) 47 Cal.App.5th 1036 (*J.A.*), Father contends the evidence is insufficient to support section 300(b)(1) jurisdiction. However, in *J.A.* the baby tested positive only for marijuana—mother admitted consuming edible marijuana but denied smoking. (*Id.* at p. 1038.) After giving birth, mother stopped ingesting marijuana and consistently tested negative. (*Ibid.*) Mother had no criminal history. (*Ibid.*) The critical fact distinguishing *J.A.*—absent here—is there was no evidence of drug *abuse*. (*Id.* at p. 1046.) "The evidence of mother's substance use is, at most, that she used edible marijuana while pregnant, to address her pregnancy symptoms, after having researched that it was a relatively safe alternative. She claims that she was never high or under the influence when she used it. She claims that she easily stopped using as soon as she was told to do so; her drug tests support this. This is not substantial evidence—or any evidence— of substance abuse." (*Id.* at p. 1047.)

In contrast here, in August Father told the social worker that after S.T.'s birth Mother was using methamphetamine. In December, Mother told the Agency she was using methamphetamine "twice a month."

In a related argument, Father asserts that the evidence showed "at most" Mother's "unwise use of intoxicants" during her pregnancy. From that premise, Father contends there was "no evidence" that S.T. had suffered

19

"serious physical harm or illness" as required under section 300(b)(1), or that harm should "have even been expected." He asserts that S.T. "was not under the influence, had no withdrawal symptoms, and appeared normal thereafter."

This argument fails because methamphetamine is far more than an "unwise use of intoxicants" during pregnancy. Moreover, Mother's unexcused absence at scheduled drug tests on July 18 and July 22 are considered positive test results. (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217.) On July 26, Mother actually tested positive for methamphetamine, amphetamine, THC, and alcohol.

Citing *In re Rebecca C.* (2014) 228 Cal.App.4th 720 (*Rebecca C.*), Father also contends there is insufficient evidence of a substantial risk of future harm, "even if the evidence showed [that Mother is] suffering from substance abuse." However, *Rebecca C.* involved a 13-year-old, not an infant. (*Id.* at p. 727.) Unlike S.T., a teenager is " 'old enough to avoid the kinds of physical dangers which make infancy an inherently hazardous period of life.' " (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004.)[13]

Father also contends that the juvenile court "did not address 'substantial risk' of harm but, instead, simply asserted its jurisdiction based on S.T.'s toxicology." However, the record shows otherwise. In ruling from the bench, the juvenile court stated, "A positive tox baby starts the process. But it doesn't necessarily end the process. The question, as all attorneys have pointed out to this court, is, is there a substantial risk of harm . . . ."

---

[13] For similar reasons, we reject Father's contention that the dismissal of H.G.'s dependency petition demonstrates Mother's "adequate parental abilities" regarding infant S.T.

20

Father also asserts the court's order is undercut by evidence that (1) H.G. wanted to live with Mother; (2) both H.G. and J.H. denied that Mother used any drugs other than marijuana; and (3) the juvenile court believed Mother's testimony that she exaggerated her methamphetamine use to qualify for the inpatient facility. These are reasonable points to make in the juvenile court. However, the appellate issue is not whether there was substantial evidence to support a different order; rather, the issue is whether substantial evidence supports the order actually made. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

II.

THE COURT'S DETENTION RULINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

A. *Legal Standards for Removal from Custodial Parent*

" ' "A dependency proceeding under section 300 is essentially a bifurcated proceeding." ' " (*E.E.*, *supra*, 49 Cal.App.5th at p. 205.) Where, as here, the court exercises jurisdiction over the minor, it must decide the appropriate disposition. "Generally, the court chooses between [1] allowing the child to remain in the home with protective services in place[;] and [2] removing the child from the home while the parent engages in services to facilitate reunification." (*Ibid.*)

S.T. was residing with Mother when the Agency filed the Petition. Accordingly, under section 361, subdivision (c)(1), the court could order S.T. detained with someone else only upon finding by clear and convincing evidence that "there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which

21

the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

We review a removal order for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) However, because the juvenile court's findings under section 361, subdivision (c)(1) must be based on clear and convincing evidence, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting [this] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

B. *Analysis*

Substantial evidence supports the court's finding by clear and convincing evidence that there would be a substantial danger to S.T.'s physical health, safety, protection, or physical or emotional well-being if he were to be returned to Mother, and there are no reasonable means of protecting S.T. without removal. As explained *ante*, Mother's prenatal use of methamphetamine and her subsequent continuing use *without treatment* evidences an inability to properly care for an infant. Moreover, at the disposition hearing, Mother denied having any unresolved methamphetamine issues—despite admitting to the social worker in December that she was still using methamphetamine. Instead of acknowledging her drug problem and getting treatment, Mother claimed, with no evidence, that the Agency fabricated her July 26 positive test results.

In determining whether a child may be safely maintained in the parent's physical custody, the court may consider the parent's past conduct if there is reason to believe the conduct will continue.  (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)  Here, Mother's untreated methamphetamine abuse coupled with her history of lying to the juvenile court, fleeing the jurisdiction with the infant, and refusing to submit to random drug tests supports the finding of no reasonable means of protecting S.T. short of his removal.

Mother also contends reversal is required because the juvenile court dismissed H.G.'s petition, which was based on essentially the same allegations as the Agency asserted in S.T.'s Petition.  However, at the time of trial H.G. was seven years old.  Caring for S.T.—an infant who is incapable of feeding or cleaning himself, has no conception of environmental hazards, and who cannot verbalize his needs—involves vigilance and parenting skills significantly different from those reasonably necessary to care for H.G.

Mother also contends the removal order should be reversed because she was "willing and able to enter a residential treatment facility" with her children.  However, the juvenile court was entitled to view any such claim with deep suspicion because Mother testified she was "not a substance abuser" and at the hearing claimed to have never knowingly taken methamphetamine.

Mother relies on *In re Henry V.* (2004) 119 Cal.App.4th 522 (*Henry V.*), which she contends is "on point."  In that case, the appellate court reversed an order removing from his mother's custody a four-year old who had suffered first and second degree burns on his buttocks.  (*Id.* at pp. 525-526, 529.)  The appellate court characterized the abuse as "a single occurrence," noting that there was "ample evidence" of specific services available to "mitigate the risk of further physical abuse" and that there was no indication the juvenile court

"understood the necessity of making the dispositional findings on clear and convincing evidence." (*Id.* at pp. 529-530.)

We disagree with the analysis in *Henry V.* that the removal was not supported by substantial evidence. The mother purposefully burned the toddler three times on the buttocks with a curling iron, yet claimed she did not understand how the injury happened. (*Henry V.*, *supra*, 119 Cal.App.4th at pp. 525-526.) In any event, *Henry V.* is materially distinguishable because (1) Mother's *untreated* substance abuse subjects S.T. to not a single incident, but rather a continuing risk of harm; and (2) unlike the juvenile court in *Henry V.*, here the court acknowledged the clear and convincing standard of proof required for removal.

Mother's reliance on *In re A.E.* (2014) 228 Cal.App.4th 820 is also unavailing. That case involved one incident of spanking a three-year-old with a belt where there was no evidence of substance abuse. (*Id.* at p. 827.) In *A.E.*, the offending parent took responsibility for his actions, showed remorse, and demonstrated commitment to learning better child-rearing techniques. (*Id.* at pp. 826-827.) In contrast here, Mother denies she has a substance abuse problem and has a history of refusing drug testing and treatment.

## III.

### THE FINDING THAT IT WOULD BE DETRIMENTAL TO PLACE S.T. WITH FATHER IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Once a court declares a child is a dependent and removes the child from his or her custodian, the court must determine whether a noncustodial parent wants custody of the child. (§ 361.2, subd. (a).) The court must place that child with the noncustodial parent unless it finds by clear and convincing evidence that such a placement would be detrimental to the child's safety,

24

protection, or physical or emotional well-being. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)[14]

Here, Father contends the evidence is insufficient to support a finding that it is "highly probable that placing [S.T.] with [Father] would be detrimental to S.T.'s "safety, protection, or physical or emotional well-being." Father asserts the evidence falls short because "there was no proof of any actual harm" and "no evidence showed it highly probable that placing [S.T.] in [Father's] custody would have portended a substantial risk of future serious physical harm or illness."

Father's argument is untenable. Early in the case, the Agency informed Father that Mother's untreated methamphetamine use subjected S.T. to a significant risk of harm. Nevertheless, Father (1) funded Mother's flight from the Agency; and (2) surreptitiously harbored Mother and S.T. at his home, despite the court's clear directive to immediately notify the Agency upon locating S.T.

Father admits he gave Mother money when she was a fugitive and willfully failed to inform the Agency of S.T.'s known whereabouts. He justifies this conduct by claiming a superseding moral obligation to ensure S.T. had food while Mother was on the run.

---

14    Section 361.2, subdivision (a) provides in part: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

The juvenile court was entitled to view that claim with suspicion. On August 22, *before* Mother asked Father for money, Father told the social worker "it would be very hard to turn in [S.T.] to the Agency should he find him." Thus, a more plausible explanation for Father's conduct is that he never intended to cooperate with the juvenile court or the Agency if that meant S.T. was going to spend time in foster care.

Father's argument fails for another reason as well. When the case started, he told the Agency that Mother was using methamphetamine and alcohol. In August, Father told the social worker that Mother needed to "complete a drug program." But at trial, Father denied that Mother used methamphetamine and testified she is "perfectly capable" of caring for S.T. without supervision. Father's denial supports the court's finding of detriment because it indicates that the conditions that led to the dependency would likely recur. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1657-1658.)

IV.

THE COURT DID NOT IMPOSE
THE BURDEN OF PROOF ON FATHER

After determining not to place S.T. with Father, the juvenile court stated, "[Father], I want to speak to you directly." The court stated, "I want [S.T.] with you, but I have a job to do that is above just wanting something . . . but you've got to show me a little bit more than what I have before me at this time. . . . [¶] I want you to participate in services . . . . And I'm telling you right now, if I'm satisfied with your contact with the Agency, that the decision swings in your favor, it's just not swinging right now. . . . [¶] I felt that between the things that were in the report and the testimony that you gave me, I lack the confidence to make the decision to give [S.T.] to

26

you at this point in time. . . . But I want you to establish something with me over the next few months."

Father contends that by stating, "[Y]ou've got to show me a little bit more than what I have before me at this time," the juvenile court "placed the burden of proof on [Father] to fill in the gaps left by the [A]gency's evidence."

Father's argument fails because it takes the court's statements out of context. The court made these remarks *after* it had already rendered its ruling—a ruling that on its face states that the court's findings "were made by clear and convincing evidence."

Minutes earlier, County Counsel asserted, "I think it's reasonable for Father to show a track record of trust and credibility with the Agency and the court." In urging Father to "show me a little bit more" and to "establish something with me over the next few months," the court was encouraging Father to build a track record of compliance and cooperation. The court was not shifting the burden of proof, but instead was graciously giving Father a roadmap for future success.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:


O'ROURKE, Acting P. J.


GUERRERO, J.